IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:09-CT-3064-D

MATTIE SMITH as Personal )
Representative for the Estate of )
Demittarus Pernell Burden, et al., )
 )
        Plaintiffs, )
 )
v. ) **ORDER**
 )
GREG ATKINS, et al., )
 )
        Defendants. )

On March 28, 2007, at approximately 12:15 a.m., Demittarus Pernell Burden (then age 29) ("Burden" or "decedent"), committed suicide in the Bertie-Martin Regional Jail. On March 12, 2009, Burden's mother Mattie Smith ("Smith"), individually and as personal representative for Burden's estate, and Oprah Jackson ("Jackson"), the mother and next friend of Burden's four minor children (collectively "plaintiffs"), filed this action in Bertie County Superior Court [D.E. 1-9]. Plaintiffs sought relief under 42 U.S.C. § 1983 in counts one, two, and three and under North Carolina law in counts four and five. Plaintiffs named as defendants Bertie County Sheriff Greg Atkins, Jail Administrator Craig Friedman, Assistant Jail Administrators William White, Lieutenant Terrance Whitehurst, and Corporal Ricky Ryan, Martin County Sheriff Dan W. Gibbs, Martin County Deputy Sheriff Mackimsey Williams, Southern Health Partners, Trinea Jones, LPN, unknown individual employees of Southern Health Partners, and Southern Health Partners physician John Doe, M.D. See Compl. ¶¶ 4-12, 15-16. On April 6, 2009, defendants removed the action to this court [D.E. 1].

On March 4, 2010, the court dismissed the state law claims in counts four and five because plaintiffs failed to include a certification under the North Carolina Rule of Civil Procedure 9(j) [D.E. 31]. The court also granted summary judgment to Bertie County Sheriff Greg Atkins and Martin County Sheriff Dan W. Gibbs. Id. Thus, the section 1983 claims in counts one, two, and three remain.

On March 12, 2010, Southern Health Partners and Jones filed a motion to compel [D.E. 33]. On March 16, 2010, defendants filed a joint motion to strike plaintiffs' expert disclosure [D.E. 36]. On May 4, 2010, Southern Health Partners and Jones filed a second motion to compel [D.E. 42]. Finally, all defendants filed motions for summary judgment [D.E. 39, 44, 50]. As explained below, the court grants the motion to strike plaintiffs' expert disclosure, grants defendants' motions for summary judgment, and denies the motions to compel as moot.

I.

In the light most favorable to plaintiffs, the facts are as follows. In 1996, Burden (then age 18) was diagnosed with schizophrenia. In 1997, Burden began dating Jackson, who was then a high school junior. See Jackson Dep. 26–28. Burden and Jackson soon began living together with Burden's mother, and (over time) Jackson gave birth to four children. Id. at 26–28, 34–35. Jackson eventually moved out, and Burden sometimes stayed with her and sometimes stayed with his mother. Id. at 29–31. Burden and Jackson stopped dating in 2006 while Burden was in prison for seven months. Id. at 41–42.

Since Burden's schizophrenia diagnosis, several doctors treated him for mental health issues. Burden's mother and Jackson repeatedly had to prod him to take his psychiatric medication. See Smith Dep. 23, 100; Jackson Dep. 57–58. When Burden took his medicine, he seemed normal. When he did not, he heard voices, paced, and fidgeted. See Smith Dep. 54–57.

2

As an adult, Burden was arrested and confined several times in the Bertie-Martin Regional Jail ("jail"). See Comp. ¶ 34. During one stay, in June and July 2005, he was placed on suicide watch for approximately two weeks. See id. ¶ 22. Except for that one placement on suicide watch, family members never believed that Burden was suicidal. See, e.g., Stephanie Burden Dep. 27–28. Burden never spoke of suicide or attempted to harm himself. See, e.g., Smith Dep. 56, 63, 97; Jackson Dep. 57; Stephanie Burden Dep. 27, 55–56.

Burden and Jackson had a volatile relationship. Jackson Dep. 74. On June 6, 2005, Burden assaulted Jackson and she received medical treatment for her injuries. Id. at 65–66. On January 27, 2006, eight days after Jackson had given birth to one of their children, Burden demanded sex. Jackson refused, and Burden punched her in the face. Id. at 68–70, Ex. 4. Jackson then obtained a domestic-violence protective order against Burden. Id. at 63.

In February 2007, Burden violated the domestic-violence protective order when he went to Jackson's home. See Jackson Dep. 51–55, Ex. 8. The police were called, but Burden fled before the police arrived. On February 17, 2007, Burden voluntarily admitted himself to Northside Mental Health Hospital ("Northside"). At Northside, unbeknownst to Jackson or Burden's other family members, Burden expressed suicidal ideation. See Comp. ¶¶ 28–29; Jackson Dep. 43, 47–48, 140.

On March 10, 2007, Northside discharged Burden, instructed him to take Trazodone, Abilify, Ativan, and Cogentin, and scheduled a follow-up appointment for March 13, 2007. See Compl. ¶ 30. On March 12, 2007, Burden went to Jackson's home in violation of the domestic–violence protective order. The police were called, arrested Burden, and charged him with resisting arrest. See Smith Dep. 46–48, 92.

On March 14, 2007, Burden was convicted of resisting arrest and sentenced to 150 days in the North Carolina Department of Correction. See Smith Dep. 92, 95; Jackson Dep. 55–56. While

3

awaiting transfer to state prison, Burden was placed in the jail.

When Burden arrived at the jail, Burden's demeanor was calm, and he did not indicate that he had any medical problems. Friedman Dep. 46. Burden did not appear suicidal. Id. at 46, 59–61. Burden completed a medical screening questionnaire. See Friedman Dep. 46, Ex. 16. Burden only indicated he had "bad nerves" and an allergy to pork. See id., Ex. 16. No risk of suicide was noted. Id. Because Burden's intake screening form was "negative," a medical examination was scheduled for March 28, 2007, with Southern Health Partners. See T. Jones Dep. 48–49.

Southern Health Partners contracted with the jail to provide medical services to inmates at the jail. See Friedman Dep. 16. Southern Health Partners is a private, independent contractor. Id. In February 2006, Southern Health Partners hired Trinea Jones, a licensed practical nurse, to provide medical services at the jail. T. Jones Dep. 7–8. As part of her employment with Southern Health Partners, Jones received training on suicide prevention. See Harrison Aff. ¶¶ 3–6.

On March 14, 2007, Burden's mother brought Burden's prescription bottles for Trazodone, Abilify, Ativan, and Cogentin to the jail. See Smith Dep. 53–54. Burden's mother provided the medicine to jail personnel, who, in turn, provided them to Jones. See id.; T. Jones Dep. 13–14, 51–54. Jones examined the medicine. See T. Jones Dep. 52–53. The Abilify bottle was empty. See id. Abilify and Ativan were not on Southern Health Partners' formulary (i.e., list of approved drugs) and could not be distributed to Burden. See id. at 39, 52–53. As a result, Burden did not receive Abilify or Ativan. See id. Although Jones does not have a specific memory concerning Burden's treatment, Jones believes that she would have contacted the pharmacy and Burden's family regarding any non-approved prescription drugs. See id. at 51–54.

During Burden's incarceration, the jail personnel offered Cogentin and Trazodone to Burden every day. See T. Jones Dep., Ex 18. Jones prepared the medication, but the jail officers provided

4

it to Burden. See T. Jones Dep. 21–26, 39; Whitehurst Dep. 60; Friedman Dep. 44. On some days, Burden did not take his entire dosage. T. Jones Dep. 32–33. The jail does not have a policy on how to handle prisoners who refuse to take their medication. See Friedman Dep. 44. Jail officers cannot force a prisoner to take his medicine. See id. at 60–62.; T. Jones Dep. 33–34.

While incarcerated, the jail did not treat Burden as a suicide risk. The jail considers a prisoner to be a suicide risk when he states an intent to commit suicide, tries to hurt himself, or demonstrates erratic behavior, or when a family member advises the jail of such a risk. See Whitehurst Dep. 10–11; Ryan Dep. 11. The jail also considers any prisoner who has ever been on suicide watch to be a suicide risk. See Friedman Dep. 26; Friedman Aff., Ex. A at 2; 10A N.C. Admin. Code 14J.0601(c). When the jail considers a prisoner to be a suicide risk, the jail puts the prisoner on suicide watch. When a prisoner is on suicide watch, jail officials are to observe his cell four times an hour. Friedman Dep. 24; Friedman Aff., Ex. A at 2; 10A N.C. Admin. Code 14J.0601(c). In contrast, when a prisoner is not on suicide watch, jail officials are to observe his cell two times per hour. Friedman Dep. 22; Ryan Dep. 14–15; Friedman Aff., Ex. A at 1; 10A N.C. Admin. Code 14J.0601(a). Because Burden had been on suicide watch in 2005, Burden should have been put on suicide watch and jail personnel should have checked Burden's cell four times an hour. See Friedman Dep. 26; Whitehurst Dep. 25; Friedman Aff. ¶ 4, Ex. A; 10A N.C. Admin. Code 14J.0601(c).

On March 14, 2007, when Burden was booked into the jail, the booking officers were not aware that he had been on suicide watch in 2005. Such information is contained in a prisoner's medical file, which booking officers do not have access to due to privacy provisions in the Health Insurance and Portability and Accounting Act ("HIPAA"). See Friedman Dep. 24–26. The jail administrator can check the prisoner's medical file, but jail officers cannot. Id. at 26–26; Whitehurst

Dep. 15–19. Friedman, the jail administrator, and White, the assistant jail administrator, did not check Burden's medical file and also did not recall that Burden had been on suicide watch in 2005. See Friedman Dep. 26; White Dep. 20–24. Likewise, although Lieutenant Whitehurst worked at the jail in 2005, he did not check Burden's medical file or recall that Burden had been on suicide watch in 2005. See Whitehurst Dep. 27–28, 34–35, 56–57, 66. As for Corporal Ryan, he also worked at the jail in 2005 and did recall that Burden had been on suicide watch in 2005. See Ryan Dep. 17–18. Ryan, however, failed to tell his supervisors that he recalled that Burden had been on suicide watch in 2005. Id. at 38.

On March 27, 2007, Burden asked to be moved from B block because some prisoners were taking his food. See Friedman Dep. 22, 32–33. Burden was moved to F Block, Cell F-3. Id. Jailers checked Burden's cell two times per hour. See Friedman Dep. 30–40, Exs. 14, 15. According to Lieutenant Whitehurst, Burden's cell was checked at 11:57 p.m. on March 27, 2007, and at 12:05 a.m. on March 28, 2007, and Burden was fine. See Whitehurst Dep. 44–54. At 12:15 a.m. on March 28, 2007, Whitehurst heard Burden's cellmate yell that Burden was trying to hang himself. Id. at 35–36; Ryan Dep. 23–24. Corporal Ryan ran to the cell and found Burden hanging from a vent with a sheet tied around his neck. Ryan Dep. 25–27. Ryan jumped on the bed, tried to hold Burden up to keep him from strangling himself, and called for help. See id.; Williams Dep. 19–22; Whitehurst Dep. 36–37. Lieutenant Whitehurst and Martin County Deputy Sheriff Mackinsey Williams (who did not work at the jail, but happened to be at the jail dropping off a prisoner) ran to the cell to assist Corporal Ryan. Whitehurst and Williams were unable to untie the knot. Thus, Williams ran to get scissors, returned, and cut the sheet. Williams Dep. 22–23; Whitehurst Dep. 36–37.

The officers untied the sheet from Burden's neck. Whitehurst and Ryan began CPR. See Ryan Dep. 28–30; Whitehurst Dep. 37–38; Williams Dep. 23. Other officers called for emergency

6

medical assistance and various officers performed CPR on Burden while awaiting the medical personnel. Paramedics arrived, continued to treat Burden, and took him to Bertie Memorial Hospital. See Ryan Dep. 30–31; Williams Dep. 26; Whitehurst Dep. 37–38. At Bertie Memorial Hospital, Burden was declared dead. Compl. ¶ 38. Burden's suicide was the first attempted or successful suicide at the jail in about 20 years. See Whitehurst Dep. 55–56.

II.

On March 16, 2010, defendants filed a joint motion to strike plaintiffs' expert disclosure. In support, defendants filed exhibits demonstrating that plaintiffs failed to provide an expert witness disclosure that complied with Federal Rule of Civil Procedure 26(a)(2)(B). Mem. Supp. Defs.' Mot. Strike, Exs. 1–2. See, e.g., Gallagher v. S. Source Packaging, LLC, 568 F. Supp. 2d 624, 628 (E.D.N.C. 2008) (describing requirements of expert witness disclosure, including the requirements of the expert's written report). Notwithstanding defendants' commendable efforts to cajole plaintiffs into providing an expert witness disclosure that complied with Rule 26(b)(2)(B), plaintiffs never did. Mem. Supp. Defs.' Mot. Strike, Exs. 3–9. Indeed, plaintiffs never bothered to file a response to defendants' joint motion to strike plaintiffs' expert disclosure.

Plaintiffs failed to comply with Rule 26(a)(2)(B). Accordingly, the court grants the joint motion to strike, and plaintiffs are not permitted to use or rely on evidence from Dr. Jonathan Stoudmire or Alvin Cohn.

III.

In considering the motions for summary judgment, the court views the evidence in the light most favorable to plaintiffs and applies well-established principles under Rule 56 of the Federal Rules of Civil Procedure. See, e.g., Fed. R. Civ. P. 56; Scott v. Harris, 550 U.S. 372, 378 (2007); Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

247–55 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is appropriate when there exists no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see Anderson, 477 U.S. at 247–48. The party seeking summary judgment bears the burden of initially coming forward and demonstrating an absence of a genuine issue of material fact. See, e.g., Celotex Corp., 477 U.S. at 323. Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact regarding trial. See Matsushita Elec. Indus. Co., 475 U.S. at 587. There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. See Anderson, 477 U.S. at 250.

A.

Initially, the court addresses the motion for summary judgment of Martin County Deputy Sheriff Mackinsey Williams. Plaintiffs' only claim against Williams is the section 1983 Eighth Amendment claim in count one. See Compl. ¶¶ 39–41.[1]

The Eighth Amendment's ban on "cruel and unusual punishment" requires jail officials to take reasonable measures to guarantee the safety of inmates, including providing adequate medical care. See Farmer v. Brennan, 511 U.S. 825, 832 (1994). The Supreme Court has stated that

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference.

Id. at 837. Moreover, in order to be liable under section 1983, plaintiffs must show that Williams "acted personally" to deprive plaintiffs of their constitutional rights. See, e.g., Ashcroft v. Iqbal,

---

[1] Count two is directed at Southern Health Partners and its employees. See Compl. ¶¶ 42–46. Count three is directed at the jail and its employees. Id. ¶¶ 47–50. Williams was not and has never been an employee of Southern Health Partners or the jail. See Williams Aff. ¶¶ 2–5.

8

129 S. Ct. 1937, 1949 (2009); Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985).

An Eighth Amendment claim based on inadequate medical care requires a plaintiff to prove two elements: (1) the prisoner suffered an objectively serious harm that presented a substantial risk to his safety; and (2) defendants were deliberately indifferent to that risk. See, e.g., Iko v. Shreve, 535 F.3d 225, 241–43 (4th Cir. 2008); Collins v. Seeman, 462 F.3d 757, 760 (7th Cir. 2006). In a jail suicide case, the first element is satisfied because "suicide is a serious harm." Collins, 462 F.3d at 760. The second element — deliberate indifference — requires a dual showing: "that the defendant (1) subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded the risk." Id. at 761; Simmons v. Navajo County, 609 F.3d 1011, 1018 (9th Cir. 2010); Minix v. Canarecci, 597 F.3d 824, 831 (7th Cir. 2010); Short v. Smoot, 436 F.3d 422, 427 (4th Cir. 2006); Snow ex rel. Snow v. City of Citronelle, 420 F.3d 1262, 1268–69 (11th Cir. 2005); Gray v. City of Detroit, 399 F.3d 612, 616 (6th Cir. 2005); Woloszyn v. County of Lawrence, 396 F.3d 314, 320–21 (3d Cir. 2005).

Here, Williams simply happened to be at the jail delivering a prisoner when he heard Corporal Ryan call for help. Williams then went to assist Ryan in attempting to save Burden's life. Williams did not know Burden or anything about him, or have any responsibilities associated with Burden's custody. See Williams Aff. ¶¶ 2–5. As a matter of law, Williams did not know Burden was at substantial risk of committing suicide or intentionally disregard such a risk. Accordingly, the Eighth Amendment claim against Williams fails, and the court grants summary judgment to Williams.

B.

Next, the court addresses the motion for summary judgment of defendants Friedman, White, Whitehurst, and Ryan. Plaintiffs allege that Friedman, White, Whitehurst, and Ryan were

9

deliberately indifferent to Burden's substantial risk of committing suicide and thereby violated the Eighth Amendment. See Compl. ¶¶ 39–41 (count one). Plaintiffs also allege that Friedman, White, Whitehurst, and Ryan failed to train and supervise jail personnel to recognize and treat suicidal inmates. See id. ¶¶ 47–50 (count three).

As for count one, the court must focus on whether defendants actually knew and disregarded an objectively serious risk that Burden would commit suicide. See, e.g., Farmer, 511 U.S. at 837; Simmons, 609 F.3d at 1018; Minix, 597 F.3d at 831. "[T]he official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he also must draw the inference." Farmer, 511 U.S. at 837; Iko, 535 F.3d at 241–42; Short, 436 F.3d at 427. The deliberate indifference standard "entails something more than negligence, . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer, 511 U.S. at 835; Iko, 535 F.3d at 241–42; Brown v. Harris, 240 F.3d 383, 389 (4th Cir. 2001).

The record fails to demonstrate that Friedman, White, Whitehurst, or Ryan subjectively knew that Burden was at substantial risk of committing suicide and intentionally disregarded the risk. Burden completed a questionnaire at intake and expressed no hint of suicidal ideation. Friedman Dep. 46, Ex. 16. Defendants observed Burden during his March 2007 incarceration, and he never said or did anything to indicate that he might be suicidal. See Friedman Aff. ¶ 2; White Aff. ¶ 2; Whitehurst Aff. ¶ 2; Ryan Aff. ¶ 2; Friedman Dep. 34, 67–68; Whitehurst Dep. 58–59; Ryan Dep. 42. Indeed, none of Burden's family members (including his mother who visited him in the jail in March 2007) believed that he was suicidal in March 2007. See, e.g., Smith Dep. 50, 63. Moreover, throughout his March 2007 incarceration at the jail, Burden received Trazodone and Cogentin, and officers checked on him two times per hour. See T. Jones Dep., Ex. 18; Friedman Dep. 22; Ryan

10

Dep. 14–15. Friedman, White, Whitehurst, and Ryan were not deliberately indifferent towards Burden; therefore, plaintiffs' Eighth Amendment claim fails. See, e.g., Farmer, 511 U.S. at 844–45; Simmons, 609 F.3d at 1018–20; Minix, 597 F.3d at 831–34; Snow, 420 F.3d at 1269; Collins, 462 F.3d at 761–62; Short, 436 F.3d at 428–29; Gray, 399 F.3d at 616; Woloszyn, 396 F.3d at 322–24.

In opposition to this conclusion, plaintiffs note that Burden was placed on suicide watch in 2005 at the jail and if Friedman, White, or Whitehurst had checked Burden's jail medical file or recalled his 2005 incarceration, then they would have known this fact. As for Ryan, he recalled that Burden had been on suicide watch in 2005, but failed to remind his supervisors of this fact. Moreover, because Burden had been on suicide watch in 2005, jail policy and state regulation required officers to check Burden four times per hour instead of two times per hour. Furthermore, plaintiffs note that Burden did not receive all four of his prescribed medicines and that jail officials did not force him to take the psychotropic medicine.

The cited evidence does not create a genuine issue of material fact concerning deliberate indifference. Simply because Burden had been on suicide watch in the jail in 2005 did not put defendants on notice that he was suicidal in March 2007. The lapse in time between Burden's 2005 incarceration and his March 2007 incarceration defeats the notion that defendants knew and disregarded an objectively serious risk that Burden would commit suicide in March 2007. See, e.g., Matos ex rel. Matos v. O'Sullivan, 335 F.3d 553, 557–58 (7th Cir. 2003); Lambert v. City of Dumas, 187 F.3d 931, 937–38 (8th Cir. 1999). Moreover, even though state regulation and jail policy required a four-time per hour check on any prisoner who ever has been on suicide watch, and even though Friedman, White, and Whitehurst did not recall Burden's 2005 incarceration, did not recall that Burden had been on suicide watch in 2005, and did not check Burden's jail medical file to see whether Burden had been on suicide watch, the mere failure to comply with this state regulation and

11

jail policy is not a constitutional violation. See, e.g., Davis v. Scherer, 468 U.S. 183, 194–96 (1984); Minix, 597 F.3d at 834; Crocker ex rel. Estate of Tarzwell v. County of Macomb, 119 F. App'x 718, 725 (6th Cir. 2005); Altman v. City of High Point, 330 F.3d 194, 208 (4th Cir. 2003); Roberts v. City of Troy, 773 F.2d 720, 726 (6th Cir. 1985). Likewise, in light of the entire record (including Burden's behavior in the jail in March 2007), Ryan's failure to notify his superiors in March 2007 that he recalled that Burden had been on suicide watch in 2005 does not create a genuine issue of material fact as to deliberate indifference to a substantial risk of suicide. Cf. Ryan Aff. ¶¶ 1–2. At most, it bespeaks possible negligence. Furthermore, no evidence indicates that if defendants had checked Burden four times per hour, that he would not have hung himself at 12:15 a.m. on March 28, 2007. Indeed, officers checked Burden at 11:57 p.m. and 12:05 a.m., yet he hung himself at 12:15 a.m.

As for the argument concerning Burden's psychotropic medication, simply because a prisoner is prescribed psychotropic medication does not create a substantial risk that an inmate will commit suicide. See, e.g., Gordon v. Kidd, 971 F.2d 1087, 1092–95 (4th Cir. 1992). Moreover, plaintiffs have presented no expert testimony concerning the physiological effects of the four prescribed narcotics or the effects of providing only two to Burden or the effects of Burden's failure to take some of his psychotropic medicine. Without such expert testimony, plaintiffs cannot use evidence associated with Burden's medications to prove deliberate indifference. See, e.g., Senty-Haugen v. Goodno, 462 F.3d 876, 890 (8th Cir. 2006); Alberson v. Norris, 458 F.3d 762, 765–66 (8th Cir. 2006); Montgomery v. Pinchak, 294 F.3d 492, 504 (3d Cir. 2002); Langton v. Peters, 100 F.3d 1235, 1240 (7th Cir. 1996); Boring v. Kozakiewicz, 833 F.2d 468, 473–74 (3d Cir. 1987). Finally, no evidence suggest that the officers (or even Burden's family) knew that Burden expressed suicidal ideation in February 2007 at Northside. In addition, the record demonstrates that Burden never

expressed (implicitly or explicitly) suicidal ideation in March 2007 at the jail. Furthermore, the officers could not force Burden to take his psychotropic medicine. See, e.g., Sell v. United States, 539 U.S. 166, 178–79 (2003); Washington v. Harper, 494 U.S. 210, 227–36 (1990).

"Suicide is a difficult event to predict and prevent and often occurs without warning. Both the common law and recently developed constitutional law applying to those in custody have taken this uncertainty into account...." Gray, 399 F.3d at 616. Burden's suicide is tragic. Nonetheless, because Friedman, White, Whitehurst, and Ryan were not deliberately indifferent to the risk that Burden would commit suicide, the court grants their motion for summary judgment on count one.[2]

As for count three, because there is no underlying constitutional violation, plaintiffs' claim in count three concerning defendants' customs, policies, practices, procedure, and training fails. See, e.g., City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (per curiam); Waybright v. Frederick County, 528 F.3d 199, 209 (4th Cir. 2008); Gish v. Thomas, 516 F.3d 952, 955 (11th Cir. 2008); Wilson v. Flynn, 429 F.3d 465, 469 n.* (4th Cir. 2005); Snow, 420 F.3d at 1270–71; Bradich ex rel. Estate of Bradich v. City of Chicago, 413 F.3d 688, 690 (7th Cir. 2005); Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., 402 F.3d 1092, 1115 (11th Cir. 2005); Grayson v. Peed, 195 F.3d 692, 696 (4th Cir. 1999); Belcher v. Oliver, 898 F.2d 32, 36 (4th Cir. 1990).

Alternatively, count three fails because no rational jury could find that defendants caused a constitutional deprivation through an official policy or custom. See, e.g., Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403–04 (1997); Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978); Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999). Notably, not every municipal official's action or inaction represents municipal policy. Rather, the inquiry focuses on whether the municipal

---

[2] In light of this conclusion, the court need not address defendants' qualified immunity argument.

13

official possessed final policymaking authority with respect to the action or inaction. See, e.g., Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986); Riddick v. Sch. Bd., 238 F.3d 518, 523 (4th Cir. 2000). Furthermore, even if a section 1983 plaintiff can identify the requisite final authority, a municipality is not liable simply because a section 1983 plaintiff "is able to identify conduct attributable to the municipality." Riddick, 238 F.3d at 524. Instead, a section 1983 "plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." Brown, 520 U.S. at 404 (emphasis removed); City of Canton v. Harris, 489 U.S. 378, 389 (1989); Riddick, 238 F.3d at 524. Hence, in order to avoid imposing respondeat superior liability on municipalities, a section 1983 plaintiff must show that "a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." Brown, 520 U.S. at 411; Harris, 489 U.S. at 392; Riddick, 238 F.3d at 524; Carter, 164 F.3d at 218.

As mentioned, "[d]eliberate indifference is a very high standard — a showing of mere negligence will not meet it." Grayson, 195 F.3d at 695. Deliberate indifference requires "proof that a municipal actor disregarded a known or obvious consequence of his action [or inaction]." Brown, 520 U.S. at 410. Moreover, even if a section 1983 plaintiff can show the requisite culpability, a section 1983 plaintiff must show " a direct causal link between the municipal action [or inaction] and the deprivation of federal rights." Id. at 404. Deliberate indifference and causation are separate requirements. Id.

Here, plaintiffs have simply failed to raise a genuine issue of material facts in count three as to each defendant's final policymaking authority, deliberate indifference, and causation. See, e.g., id.; Riddick, 238 F.3d at 524–26. Thus, count three fails.

To the extent that plaintiffs claim in count three concerns a failure to train, plaintiffs have

failed to show a "direct causal link" between "a specific deficiency in training and the particular violation alleged." Buffington v. Baltimore County, 913 F.2d 113, 122 (4th Cir. 1990). It does not "suffice to prove that an injury . . . could have been avoided if an officer had better or more training, sufficient to equip him to avoid the particular injury-causing conduct" because "[s]uch a claim could be made about almost any encounter." Harris, 489 U.S. at 391. Instead, a plaintiff must demonstrate specific training deficiencies and either (1) that inadequately trained employees engaged in a pattern of unconstitutional conduct, or (2) that a violation of a federal right is a "highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." See, e.g., Brown, 520 U.S. at 407–09; Harris, 489 U.S. at 391; Cornfield v. Consol. High Sch. Dist. No. 230, 991 F.2d 1316, 1327 (7th Cir. 1993); Hill v. Robeson County, 733 F. Supp. 2d 676, 686–88 (E.D.N.C. 2010). In the second situation, the need for "more or different training" must be "so obvious, and the inadequacy so likely to result in the violation of constitutional rights that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." Harris, 489 U.S. at 390.

Here, plaintiffs have not identified any specific training deficiencies, and there is no pattern of unconstitutional conduct. See, e.g., Oklahoma City v. Tuttle, 471 U.S. 808, 824 (1985) (plurality opinion) ("But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality and the causal connection between the 'policy' and the constitutional deprivation." (footnote omitted)); Doe v. Broderick, 225 F.3d 440, 456 (4th Cir. 2000); Semple v. City of Moundsville, 195 F.3d 708, 713–14 (4th Cir. 1999); Spell v. McDaniel, 824 F.2d 1380, 1391 (4th Cir. 1987). Rather, this case involves one tragic suicide. Likewise, no rational jury could find that a violation of the Eighth Amendment is a highly predictable consequence of the jails' current

policies and training concerning suicidal inmates. Cf. Friedman Dep. 19–26; Friedman Aff. ¶ 4, Ex. A. Accordingly, the Eighth Amendment claim in count three fails, and the court grants summary judgment to Friedman, White, Whitehurst, and Ryan.

C.

Next, the court addressees the motion for summary judgment of defendants Southern Health Partners and Trinea Jones. Plaintiffs allege that Southern Health Partners and Trinea Jones were deliberately indifferent to Burden's serious risk of suicide and that Southern Health Partners failed to train and supervise its personnel to recognize and treat suicidal inmates. See Compl. ¶¶ 42–46 (count two).

As for Jones, she had no personal interaction with Burden in 2005 or 2007. See T. Jones Dep. 11. Jones was not aware that Burden was schizophrenic or suicidal or that Jones was treated at Northside in February 2007. Id. at 14–15, 54, 58. Moreover, during Burden's March 2007 incarceration, Burden never submitted a sick call slip or requested medical attention. Id. at 55. If Jones had known or been told that Burden might pose a danger to himself, she would have examined him. Id. Because Burden's intake questionnaire was negative, Jones did not immediately schedule him for an examination, but had scheduled him for an examination on March 28, 2007. Burden, however, killed himself at 12:15 a.m. on March 28, 2007. Thus, Jones never examined Burden.

As with plaintiffs' claim against the other defendants, plaintiffs' claim against Jones fails because no rational jury could find that Jones subjectively knew that Burden was at substantial risk of committing suicide and intentionally disregarded the risk. At most, Jones knew that Burden was prescribed certain psychotropic medications, that he was receiving two of the four medicines prescribed for him, that the other two medicines were not on Southern Health Partners' approved drug list, and that Burden sometimes did not take his medicine. Such evidence simply fails to meet

16

the particularly high bar of deliberate indifference. See, e.g., Farmer, 511 U.S. at 837; Simmons, 609 F.3d at 1018–20; Minix, 597 F.3d at 833–34; Collins, 462 F.3d at 762; Gray, 399 F.3d at 616; Woloszyn, 396 F.3d at 323–24; Matos, 335 F.3d at 555–57.

As for Southern Health Partners, plaintiffs seek to hold it liable for failing to train its personnel to recognize and properly care for suicidal inmates and for failing to institute proper procedures. See Compl. ¶ 44. The same standards that apply to municipalities apply to Southern Health Partners. See, e.g., West v. Atkins, 487 U.S. 42, 54–58 (1988); Minix, 597 F.3d at 832; Rodriguez v. Smithfield Packing Co., 338 F.3d 348, 355 (4th Cir. 2003); Conner v. Donnelly, 42 F.3d 220, 228 (4th Cir. 1994). Thus, Southern Health Partners cannot be liable for Jones's conduct under a respondeat superior theory. See Harris, 489 U.S. at 387–88; Polk County v. Dodson, 454 U.S. 312, 325–26 (1981); Monell, 436 U.S. at 694.

As for a section 1983 claim against Southern Health Partners for an official policy or custom which caused the alleged constitutional violation, the absence of an underlying constitutional violation dooms the claim. See, e.g., Heller, 475 U.S. at 799. Alternatively, Southern Health Partners cannot be liable for a failure to train or to have policies concerning inmate suicides because it, in fact, had such policies and conducted such training. See Harrison. Aff. ¶¶ 3–6; cf. Minix, 597 F.3d at 832; Woloszyn, 396 F.3d at 324–26. Even assuming that Jones failed to act in accordance with such policies and such training,[3] that lapse would not make Southern Health Partners liable under section 1983. See, e.g., Minix, 597 F.3d at 832–33; Bradich, 413 F.3d at 690. Finally, and in any event, plaintiffs have presented no evidence that Southern Health Partners alleged failure to train or alleged failure to have "better" policies caused Burden's suicide. See, e.g., Brown, 520 U.S.

---

[3] There is no evidence that Jones failed to act in accordance with Southern Health Partners's policies or her training.

17

at 404; Harris, 489 U.S. at 390–91; Minix, 597 F.3d at 832–33; Buffington, 913 F.2d at 122.

IV.

In sum, the court GRANTS the motion to strike plaintiffs' expert disclosure [D.E. 36], GRANTS defendants' motions for summary judgment [D.E. 39, 44, 50], and DENIES the motions to compel [D.E. 33, 42] as moot. The Clerk of Court is DIRECTED to close the case.

SO ORDERED. This 22 day of February 2011.

JAMES C. DEVER III
United States District Judge